[No. 11627.   Department One.   July 13, 1914.]

J. MATZGER, *Respondent,* v. ARCADE BUILDING & REALTY COMPANY, *Appellant.*[1]

FRAUDS, STATUTE OF—WAIVER OF BAR—PART PERFORMANCE—ESTOPPEL. A lessor is estopped to question the validity of an unacknowledged lease for a term of five years, where it appears that, to secure the lease, the tenant cancelled a prior valid lease and paid $2,200 increased rentals for the last eight months of the term thereof, that after the lease had run four years the lessor, on denying an application for a renewal at the end of the term, recognized the lease by telling the agent he could remain for the end of the term (making in effect a new lease for less than a year), and that the lessee, upon the faith thereof, invested $30,000 in new stock upon which he would sustain a heavy loss if required to move before the end of the year.

PRINCIPAL AND AGENT—ACTS OF AGENT—RATIFICATION. A landlord accepting the benefits of a lease made by its authorized agent in his own name, without questioning its validity, adopts the same as its own, where the principles of equitable estoppel intervene to prevent a denial of its validity for want of acknowledgment.

ESTOPPEL—PLEADING—NECESSITY. Where the facts constituting an estoppel to deny a lease are set forth in the pleadings, and early in the trial the pleader assumed that he relied upon an estoppel to deny the lease, to which no claim of surprise was interposed nor request for a continuance made, the objection that an estoppel was not specifically pleaded is unavailable.

Appeal from a judgment of the superior court for King county, Albertson, J., entered April 23, 1913, upon find-

[1] Reported in 141 Pac. 900.

ings in favor of the plaintiff, in an action for an injunction, tried to the court. Affirmed.

*Beebe & Whitcomb* (*Peters & Powell,* of counsel), for appellant.

*Preston & Thorgrimson,* for respondent.

ELLIS, J.—The plaintiff, claiming to be the lessee, for a term expiring December 31, 1913, of a storeroom in the Arcade Building, in the city of Seattle, brought this action to enjoin the defendant, the owner of the building, from erecting certain structures in a private alley in the rear of the storeroom, obstructing access of light and air. The defendant denied that the plaintiff had anything but a month to month lease. In order to any understanding of the questions involved, a somewhat detailed statement of the evidence is necessary.

The plaintiff testified that he first went into possession under a lease for two years; that the Moore Investment Company, of which James A. Moore was the manager, then had charge of the building; that, on the expiration of that lease, he received a second lease of the building for a term of six years. This lease, a copy of which is in evidence, was dated January 1, 1904, by its terms ran to January 1, 1910, and was executed by the Moore Investment Company by James A. Moore, its manager. It was not acknowledged. This lease provided for certain lower rentals payable monthly to January 1, 1908, and from then on, during the term, for a rental of $225 a month. It is undisputed that the plaintiff remained in possession under this lease until within a year of its expiration. The plaintiff testified that, early in January, 1909, when the lease still had less than a year to run, he, being desirous of securing a new lease, went to Moore, who was still managing the building, to secure a new lease; that Moore then informed the plaintiff that, if he would cancel the old lease for the last eight months of its term, he would give a new lease on condition that the plaintiff pay

$275 a month increase, or $500 a month rental for the last eight months of the old lease, and agree to pay $500 a month for a new lease running for a period of four years, and also purchase from Moore sixty shares of stock in the Irondale Steel Company for $3,000 cash; that Moore informed the plaintiff that, if he wanted to stay in the building he would have to buy this stock, and that this applied not only to the plaintiff but to every tenant in the building. It is conceded that this stock was practically worthless and the evidence is conclusive that the plaintiff purchased it only to secure the lease.

A lease, which is in evidence, was then drawn and executed in the name of the Moore Investment Company by James A. Moore, its manager. It was dated April 14, 1909, and purported to run for a term of five years from January 1, 1909, to December 31, 1913, and provided for the payment of a monthly rental of $225 a month for January, February, March and April, 1909, and for a monthly rental of $500 a month from May 1, 1909, during the remainder of the life of the lease. It provided that no alterations should be made in the premises without the consent of the party of the first part. Like the former lease, this instrument was not acknowledged. Apparently at this time the rent of $225 a month to May 1, 1909, had been paid, and the plaintiff testified that he cancelled the last eight months of his old lease and paid at that time the increased rental of $275 a month for the period of eight months, or $2,200 down, as an inducement to the making of the new lease, and also paid $3,000 to Moore for sixty shares of stock in the Irondale Steel Company.

The Arcade Building was owned originally by the Arcade Building Company, a corporation, of which one G. Henry Whitcomb was president and the largest stockholder. At the time the new lease was entered into, the name of this corporation had been changed to Arcade Building & Realty Company, of which corporation it is admitted

G. Henry Whitcomb owned at least one-half of the stock. The plaintiff testified that, as a part of the negotiations for the lease here in question, he went to G. Henry Whitcomb and laid the matter before him, seeking to make better terms for the new lease, but Whitcomb said, "I don't think that is too much at all. That doesn't even average $500 a month, and whatever Mr. Moore does is all right. I don't mix in this at all."

The plaintiff paid the rent from January 1, 1909, to March 1, 1913, by checks payable to the Arcade Building & Realty Company. Many rent bills are in evidence. They are on printed blanks which run in the name of the "Arcade Building Company, Moore Investment Company, agents," up to 1911, and from then on in the name of "Arcade Building & Realty Company." A bundle of checks was also introduced. These checks were payable to the Arcade Building & Realty Company and were indorsed by that company, some to a bank and others to the Moore Investment Company. The plaintiff testified that, as a part of the transaction, he agreed to make alterations in the storeroom; that he went to G. Henry Whitcomb to get permission to make certain changes; that G. Henry Whitcomb asked the plaintiff to put a new front into the storeroom; that the plaintiff did not desire a new front as the old one was satisfactory, so far as he was concerned, and that he put in the new front at Mr. Whitcomb's request. He also testified that he put in certain balconies and mezzanine floors, which, with the new front, cost him $1,300; that these alterations were made soon after the making of the new lease and all of them were made after consultation with G. Henry Whitcomb, who gave his consent thereto.

The plaintiff testified that he never knew that the validity of his lease was questioned until the notice seeking to terminate it was served upon him, at which time the lease had only about ten months to run. It is admitted that, some time in the year 1911, a son of G. Henry Whitcomb, one

David Whitcomb, who was a director, vice president, and manager of the Arcade Building & Realty Company, took over the management of the Arcade Building from the Moore Investment Company. The plaintiff testified that he had had several conversations with David Whitcomb in the early part of the year 1913; that, in one of these conversations, Whitcomb proposed to purchase the remainder of the plaintiff's lease, or to arrange a purchase by another tenant occupying an adjoining storeroom who wanted more space; that the plaintiff mentioned a certain figure, and that Whitcomb told him he could not come anywhere near that figure; that about January 15, 1913, the plaintiff approached David Whitcomb, seeking to secure a new lease; that David Whitcomb then told the plaintiff he could stay in the premises until his then lease expired, but that he, Whitcomb, would not consider a new lease, and that plaintiff would have to vacate by January 1, 1914. David Whitcomb denied that he ever recognized the lease as valid. The plaintiff testified that in none of these conversations did Whitcomb intimate that the plaintiff's lease was invalid or that it created only a tenancy from month to month. David Whitcomb did not controvert this, but stated that he always avoided discussing the old lease with the plaintiff. The plaintiff testified that in December, 1912, he purchased goods for the spring trade of 1913 to an amount of fifteen or twenty thousand dollars in value, and that, about two months prior to the commencement of this action, he purchased goods for the fall trade of 1913 amounting to about $10,000 in value; that, if forced to remove before the expiration of his lease, he could not realize more than thirty-five cents on the dollar for this stock.

David Whitcomb denied that his father was in Seattle at the time the lease was made, but admitted that he, David Whitcomb, knew that some of the leases of rooms in the Arcade Building were made in the name of the Moore Investment Company and others in the name of the Arcade

Building & Realty Company, and stated that, when Moore wanted to give a real, or valid, lease, he made it in the name of the building company. He also testified that improvements made by the plaintiff did not add anything to the rental value of the premises. One of the attorneys for the plaintiff testified that, early in 1913, he called on David Whitcomb to secure an extension of the plaintiff's lease for another period; that the present lease was mentioned, but no reference was made to it by Whitcomb, who stated that the plaintiff would have to arrange to get out at the end of the year 1913, as he, Whitcomb, had arranged to give the space to another tenant. On February 26, 1913, after this action was commenced, the defendant caused notice to be served upon the plaintiff that his tenancy was only from month to month, that it would be terminated as such on March 31, 1913, and demanding a surrender of possession at that time.

The court made no separate findings, but found in the decree that the defendant was estopped to deny that the lease was a valid lease to December 31, 1913, and permanently enjoined the defendant from erecting any structures in the alley such as would interfere with the plaintiff's light and ventilation. The defendant appealed.

The appeal presents two questions: (1) Was the evidence sufficient to establish an estoppel against the defendant to deny the lease for the entire term? (2) Should the judgment be reversed because the court admitted evidence of the estoppel over the defendant's objection?

I. It is, of course, admitted that an unacknowledged lease for a term longer than one year, in the absence of equities sustaining it or estopping a denial of its validity, is void, or at least voidable under the statute of frauds. In this case, there are three elements of estoppel invoked by the respondent: (a) that respondent, on the faith of the lease, and at the time of making it, paid $2,200 increased rent for the last eight months of his old lease as a bonus

or consideration going to the entire new term, and at the same time purchased and paid $3,000 for worthless stock in the Irondale Steel Company as an inducement to the lease; (b) that he put a new front into the storeroom which he did not need and did not want, at the request of G. Henry Whitcomb, who, it is admitted, was the chief stockholder of the appellant, and that he made other improvements for his own benefit, but upon the faith of the new lease as an entirety; that all of these improvements cost the respondent $1,300; (c) that after David Whitcomb took charge of the building, and early in the spring of 1913, he, Whitcomb, as an officer and manager of the defendant company, and on its behalf, recognized the lease as valid, sought to purchase the remainder of the term, and later, about January 15, 1913, when respondent sought to secure a new lease, told the respondent that he could remain in the building until his lease expired on December 31, 1913, but would then have to vacate; that, acting upon the faith of the lease as a valid lease, the respondent, in December, 1912, purchased fifteen or twenty thousand dollars' worth of stock for the spring trade, and after David Whitcomb's express recognition of the lease as a valid lease to December 31, 1913, the respondent expended $10,000 for goods for the fall trade, and that an enforced removal would have entailed great loss to the respondent upon all of this stock. On the other hand, the appellant contends that an estoppel can only be raised by one of two things: (a) By entry under the lease and payment of rent in advance for the entire term. (b) By such entry and a making of permanent improvements by the tenant, enhancing the rental value of the freehold.

This court has never held that the payment for the entire term in advance and of the full rent reserved is a requisite to the upholding of an unacknowledged lease or even of an oral lease. On the contrary, it is fairly borne out by our own decisions that the taking of possession by the lessee and the payment of a part of the consideration or performance of

work as a part of the consideration, if such payment or work is a part of the consideration inducing the lease and going to the entire term in addition to the rental to be paid at stated periods throughout the term, constitutes such part performance as to sustain the lease for the entire term. While never announcing the foregoing in so many words, a consideration of our own decisions will show that these elements have largely entered into them and not the single element of improvements made by the tenant increasing the rental value. *McGlauflin v. Holman*, 1 Wash. 239, 24 Pac. 439; *Schulte v. Schering*, 2 Wash. 127, 26 Pac. 78; *O'Connor v. Oliver*, 45 Wash. 549, 88 Pac. 1025; *Northcraft v. Blumauer*, 53 Wash. 243, 101 Pac. 871, 132 Am. St. 1071; *O'Connor v. Enos*, 56 Wash. 448, 105 Pac. 1039.

The same rule has been invoked in favor of a lessor who, by reason of an unacknowledged lease, made improvements for the sole benefit of the lessee. *Forrester v. Reliable Transfer Co.*, 59 Wash. 86, 109 Pac. 312, Ann. Cas. 1912 A. 1093. This court has held that an oral lease, if good at all, is only good as a lease from month to month or from period to period for which the rent is payable and then only where the tenant has been put in possession (Rem. &. Bal. Code, §§ 8802, 8803; P. C. 295 §§ 1, 3), and that, in such a case, the delivery of possession alone is a sufficient part performance to overcome the fact that the lease was verbal and validates the lease as one from month to month without any other element of part performance or estoppel. *Richards v. Redelsheimer*, 36 Wash. 325, 78 Pac. 934. This holding is not in necessary conflict with the cases in which oral leases have been held valid for the entire term on facts invoking the principles of equitable estoppel in addition to the fact of delivery of possession to the tenant. This court also, in a case of an oral lease of a farm where the rent was to be one-third of the crop, held that a recognition of the lease and a promise to carry it out made less than a year from the termination of the period, even if not considered as a new lease, would ratify

the oral lease as one for less than a year, and that the defendant's possession and preparation for the crop was a sufficient part performance to take such oral lease out of the operation of the statute and sustain the lease for the full term.   *O'Connor v. Oliver,* and *O'Connor v. Enos, supra.* See, also, *Brown v. Baruch,* 24 Wash. 572, 64 Pac. 789.

The net result of the foregoing decisions is that an oral lease for a given term is sustained as a lease from month to month upon the bare circumstance of part performance by delivery of possession to the tenant, and may be sustained as a valid lease for the entire term on any state of facts showing a part performance of the consideration going to the entire term, though short of full performance.   The lease here involved was in writing and was therefore good for a period of one year.   Under the doctrine of ratification, as announced in the case of *O'Connor v. Oliver, supra,* and its sequel, *O'Connor v. Enos, supra,* a ratification by recognition of the lease as a valid lease within one year from the termination of its purported term, it would seem, ought to have the same effect as a new written lease for less than a year, as the ratification of the oral lease had in the *Oliver* case by the purchaser of the premises, who took with knowledge of the oral lease.

The appellant's argument seems so to construe the doctrine of estoppel as to limit its operation to cases where the estoppel arises from the benefits received by the lessor; that is, where the lessee has so improved the property as to add to its rental value.   Though cases in which the estoppels were based upon these circumstances are cited, no case is cited which expressly so limits the doctrine or so limits it by fair implication.   The general doctrine of estoppel is much broader than this.   It applies not only to estop one who receives and retains a benefit from denying the validity of the transaction from which he receives it, but it also applies to estop one party to a transaction from denying the validity of the transaction which, if not sustained as valid, would

put the other party, who has acted on the faith of the first party's attitude therein, in a materially worse position than he would otherwise have been. *O'Connor v. Oliver, supra,* was clearly a case of that kind. The tenant, having prepared the land and put in the crop, whether it benefited the other party or not, would have been materially damaged by loss of his work had the lease not been held valid for the entire term, notwithstanding the fact that it was verbal. It is a fallacy to assume that, as against the lessor, estoppels can only arise in favor of the lessee by the making of improvements by the lessee on the faith of the lease, beneficial to the freehold, increasing the rental value and which the tenant cannot take away. This is only one side, or, more correctly speaking, one phase of the doctrine of estoppel. We know of no reason, and none has been suggested, why one denying a contract of lease is more immune from the broad principle of equitable estoppel than one who denies any other contract. That the broad principle of equitable estoppel preventing a party to a transaction from asserting its invalidity in any case where the other party, acting on the faith of the first party's attitude touching the contract and its subject-matter, has placed himself in a position where it would be inequitable to hold the contract invalid to his injury applies alike to leases as to other contracts is clearly recognized in *Forrester v. Reliable Transfer Co., supra,* where we said (59 Wash. p. 95):

"This court has heretofore held that there may be such performance of acts referable to a lease contract that its terms will be enforced as though it had been executed with all the formalities prescribed by statute, the same as rights under an informally executed deed will be protected under like circumstances. *McGlauflin v. Holman,* 1 Wash. 239, 24 Pac. 439; *Schulte v. Schering,* 2 Wash. 127, 26 Pac. 78; *Schulte v. Littlejohn,* 2 Wash. 129, 26 Pac. 79; *Northcraft v. Blumauer,* 53 Wash. 243, 101 Pac. 871; *Koschnitzky v. Hammond Lumber Co., supra.* These cases involved both unacknowledged and oral leases. All were for terms for more

than one year, and hence, did not comply with the statute in their execution, yet their provisions were given full force and effect because of the performance of acts with reference to and in the belief that they were binding contracts between the parties."

The language which we have quoted construes our own decisions not as limiting the doctrine of equitable estoppel as applied to the sustaining of contracts of lease, but as recognizing that doctrine as applicable to such contracts with like force and to the same extent as to other contracts. A careful consideration of our own decisions convinces us that what is said in some of them relative to estoppels by improvements made by the tenant beneficial to the freehold was said because that was the only estoppel claimed in the given case, not because that was the only fact which could work an estoppel in any case. In each of the cases called to our attention and chiefly relied on by the appellant where written leases have been held invalid for lack of acknowledgment, there was apparently an absence of sufficient facts invoking the principle of equitable estoppel on any ground. In *Watkins v. Balch*, 41 Wash. 310, 83 Pac. 321, 3 L. R. A. (N. S.) 852, it did not appear that the lessee had placed himself in a worse position on the faith of the lease as one for the entire term. The case was decided without the evidence and upon the court's findings alone. By these findings it appeared that the tenant had made insignificant improvements which were held too meager to be construed as a payment of rent in advance going to the consideration of the whole term. We said:

"It, of course, is inferable that such improvements would increase the rental value to some extent, but the amount is conjectural, and as the appellants are relying on an equitable principle, *the burden was upon them to show that they would suffer some material injury if the ordinary rules of law were enforced against them.*"

The language which we have italicized shows that the court had in mind the broad principle of equitable estoppel as ap-

plied to other contracts, namely, benefit on the one side or injury on the other if the contract were not enforced. In *Dorman v. Plowman*, 41 Wash. 477, 83 Pac. 322, the last part of the opinion clearly shows that, if the purchase by the tenant of the band of cattle from the lessor had not been an independent transaction, but had formed a part of the consideration of the lease, it would have been sufficient to estop the lessor from denying the validity of the lease for the full term. The case of *Anderson v. Frye & Bruhn*, 69 Wash. 89, 124 Pac. 499, went off on the question whether the lease was, in fact, a lease for one year or more than a year. No question of estoppel as a determinative factor seems to have been involved.

In the case before us, while the evidence is conflicting, we believe it sufficiently establishes the fact that the $2,200 increased rental for the last eight months of the old lease which was then not questioned as a valid lease by either side was in the nature of a bonus or a consideration going to the entire new term and paid as an inducement for that term. It seems clear that the respondent would not have paid that sum but for the fact that he thought he was thereby securing a valid lease for four years additional to the old term. The appellant contends that this sum is insignificant as compared to the whole rental reserved in the new lease for the entire term. While it is small in comparison with the entire rent reserved, we can hardly say that, as a matter of law, $2,200 is an insignificant sum in any connection when paid as a bonus to induce a contract. As to the payment of $3,000 for the worthless steel company's stock, the evidence, while raising a suspicion that G. Henry Whitcomb, chief stockholder in the appellant company, knew that Moore was requiring these purchases from tenants in the building, it is not sufficient to establish that knowledge as a fact so as to be invoked as an element of estoppel against the appellant. We think, however, that when David Whitcomb, early in 1913, with full knowledge that the lease was made in the name of the Moore

Investment Company, with full knowledge that it was un-acknowledged and with the knowledge that the respondent claimed a valid lease extending to December 31, 1913, recognized that lease by telling both the respondent and his attorney, when a new lease was sought, that the respondent could remain in possession until December 31, 1913, was a ratification of the written lease within less than a year of its expiration and constituted, in effect, a new lease in writing for less than a year. But, aside from this, the respondent, acting upon the faith of Whitcomb's statement that he might remain in possession until December 31, 1913, invested large sums for the fall trade of that year, thus placing himself, on the faith of Whitcomb's promise, in a position where, if that promise were not kept, he stood to lose a large sum of money. In view of this situation, it would be extremely inequitable to now permit the appellant to assert the invalidity of the lease for the remainder of the term. Upon the whole record, we are unable to say that the court was in error in holding that the appellant was estopped to deny the validity of the lease.

The claim is also made, but not discussed, that the lease was void because in the name of the Moore Investment Company, not the owner of the property nor authorized by the owner to make leases. The evidence fairly established the fact that the Moore Investment Company, or Moore, its manager, had authority to lease the property, and that the form of the lease he would give was left to his discretion. Moore's agency for the appellant in the management of the building at the time the various leases referred to in evidence, including this lease, were executed is, in fact, not seriously disputed. The fact of Moore's agency made it incumbent upon the appellant to explain why the lease was so drawn by its agent. No explanation was offered except the statement of David Whitcomb that when Moore wanted to give a real or valid lease, he made it in the name of the Arcade Company. It is not disputed that the appellant knew that

Moore made leases in both ways. The appellant, with knowledge that the lease ran in the name of the Moore Investment Company, by permitting the respondent to remain in possession for almost the entire term, without questioning the lease as its own, and accepting the benefits of the contract, adopted the lease as its own. *Brown v. Baruch, supra.* In such a case, the statute of frauds is no defense.

"True, power can not be conferred on an agent to execute a deed conveying land, except by a writing of the same dignity; but there is high authority for holding, as we do, that where an agent, though verbally empowered to sell, attempts to convey land by deed, such deed will be treated as a good memorandum or contract, binding the vendor to convey the land. *Hersey v. Lambert,* 50 Minn. 373, 52 N. W. 963; *Henry v. Root,* 33 N. Y. 526, 550; *Blacknall v. Parish,* 59 N. C. 70, 78 Am. Dec. 239. So, whether or not we regard the deed of lease from Hill to Freeman a good conveyance of the equitable title of Vickers, it is good as a contract of sale by Vickers' agent, under the statute of frauds, for his equitable title, binding him and his grantees, and supporting the decree below, denying relief, and which decree we are of opinion should be affirmed." *Mustard v. Big Creek Development Co.,* 69 W. Va. 713, 72 S. E. 1021.

The same facts which establish the estoppel to deny the lease because not acknowledged operate to defeat the claim that the lease was not the lease of the appellant.

II. We find it unnecessary to enter into a lengthy discussion of the appellant's contention that evidence of estoppel should not have been admitted because estoppel was not specifically pleaded. While the facts going to establish estoppel were not specifically pleaded as estoppels, we think sufficient was alleged to put the appellant upon notice that estoppel would be relied upon. In paragraph 2 of the complaint, it is alleged that the plaintiff has paid the defendant all installments of rent due under the lease, has carried out all covenants on its part to be performed, and, under the lease, has expended several thousand dollars in fitting up the premises for use; and in paragraph 10, the plaintiff al-

leges that he has spent the sum of $4,000 in fitting up the storeroom for use as a ladies' cloak and suit store and, on account of advertising done by the plaintiff and the knowledge the public has that he is in business in the leased premises, it is impossible for the plaintiff to remove therefrom to another location without losing many thousands of dollars. Early in the course of the trial, in response to an inquiry by the court and by counsel for appellant, counsel for the respondent stated that the respondent claimed an estoppel to deny the lease. When counsel for the appellant objected to the introduction of any evidence of estoppel, on the ground that estoppel was not pleaded, the court said: "I will hear your testimony and consider the weight of the whole proof that is before the court." To this, counsel for the appellant responded: "Very well, your honor, we desire an exception."

From that time on, respondent's evidence was devoted almost entirely to proof of the facts constituting an estoppel and that of the appellant, to facts going to combat an estoppel. The appellant states that no authority has been cited showing that this court has ever gone to the length of holding that nonconformity of proof to pleadings is not fatal where seasonably objected to, either in a case in equity or at law. In the case of *Sjong v. Occidental Fish Co.*, 78 Wash. 4, 138 Pac. 313, decided since the briefs in this case were written, we said:

"In this court the appellant objects to the ruling of the trial court permitting the respondent to introduce evidence, over its objection, as to acts of negligence not specifically set forth in the complaint. But we think the appellant is not now in a position to successfully urge the objection. Had the court sustained the objection, and were the case here on an appeal by the other side, we would say unhesitatingly that no error had been committed. But a different rule obtains when the trial court treats a defective complaint as sufficient and permits each side to fully present his evidence upon the real issue in the case. In such instances, this court is enjoined by statute to hear such causes upon their merits, disregard all technicalities, and to consider all amendments

which could have been made as made. Rem. & Bal. Code, § 1752 (P. C. 81 § 1255). True, if it appears that the complaining party has been surprised or misled by the want of sufficient allegations in the pleadings, and has thereby been prevented from fully presenting his case to the jury, the error is fatal to the record, but nothing of this sort appears in the present record."

This language is cited with approval in the case of *Carlson v. Druse*, 79 Wash. 542, 140 Pac. 570. See, also, *Gaskill v. Northern Assurance Co.*, 73 Wash. 668, 132 Pac. 643. The colloquy between the court and counsel above quoted clearly advised counsel for the appellant that the respondent would rely upon estoppel as establishing a valid lease. No claim was then made of surprise nor any request for a continuance to meet that proof. We can hardly believe that the appellant was prejudiced by the breadth which the court permitted the issues to take in the evidence. Upon the whole record, we are satisfied that substantial justice has been done, and that we would be doing an idle thing to remand this cause in order that the claim of estoppel might be formally pleaded and practically the same evidence produced as that upon which the court has already based his decree.

The judgment is affirmed.

CROW, C. J., MAIN, GOSE, and CHADWICK, JJ., concur.